**AFFIRM in Part and VACATE in Part; Opinion Filed March 5, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-12-00495-CV

### SENIOR CARE RESOURCES, INC., Appellant

### V.

### OAC SENIOR LIVING, LLC, ANDREW BERRY, AND ORSON BERRY, Appellees

**On Appeal from the 101st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 11-07170**

## OPINION
Before Justices Moseley, Lang, and Richter[1]
Opinion by Justice Richter

Senior Care Resources, Inc. sued appellees, OAC Senior Living, LLC, Andrew Berry, and Orson Berry, for libel, business disparagement, and declaratory relief based on statements appellees made in communications to the Texas Department of Aging and Disability Services (DADS) as part of appellees' acquisition of Medicaid beds in Rockwall County. Senior Care appeals the trial court's summary judgment granted for appellees, which resulted in a take-nothing judgment on its claims. Because the trial court did not have jurisdiction to hear Senior Care's request for declaratory relief, we vacate that portion of the trial court's judgment and dismiss that claim for want of jurisdiction. We otherwise affirm the trial court's judgment.

---

[1] The Hon. Martin Richter, Justice, Assigned

# BACKGROUND

*Introduction*

DADS is the state agency designated to administer and monitor human services programs, including Medicaid, for the aging and disabled populations in Texas. *See* TEX. HUM. RES. CODE ANN. § 32.021(a) (West 2013); *id.* §§ 161.002, 161.071(2) (West 2013); *see also Tex. Dep't of Aging & Disability Servs. v. Sierra Home Care, L.L.C.*, 235 S.W.3d 835, 837 (Tex. App.—El Paso 2007, no pet.). DADS also licenses and regulates providers of those services, such as nursing facilities, and certifies those nursing facilities that want Medicaid or Medicare reimbursement. *See* TEX. HUM. RES. CODE ANN. § 161.071(6) (DADS's responsibilities include performing "all licensing and enforcement activities and functions" related to service providers); TEX. HEALTH & SAFETY CODE ANN. §§ 242.031–.074, 242.121–.135 (West 2010 & Supp. 2013) (quality standards that apply to nursing facilities); 40 TEX. ADMIN. CODE § 19.1(b) (West 2003); *see generally* 40 TEX. ADMIN. CODE §§ 19.1–.2326 (West 2003) (nursing facility requirements for licensure and Medicaid certification). To ensure proper and efficient operation of the Medicaid program, DADS is required to "establish methods of administration and adopt necessary rules." TEX. HUM. RES. CODE ANN. § 32.021(c).

Pursuant to its authority to administer the Medicaid program in Texas, DADS contracts with nursing facilities to provide a certain number of beds for Medicaid patients. 40 TEX. ADMIN. CODE § 19.2322(c). Senior Care operates the Royse City Health and Rehabilitation Center (the Center), which is one of four nursing facilities located in Rockwall County, Texas. The Center has elected to participate in both the Medicaid and Medicare programs. It is licensed to operate 124 beds, seventy-four of which are dually-certified for Medicare and Medicaid; the remaining fifty beds are Medicare only.

DADS is responsible for "controlling the number of Medicaid beds in nursing facilities," which it does through its "bed allocation" rules and policies. *See* TEX. HUM. RES. CODE ANN. § 32.0213(a)(1); 40 TEX. ADMIN. CODE § 19.2322(a)(3) ("Bed allocation" is the "process by which [DADS] controls the number of nursing facility beds that are eligible to become Medicaid-certified in each nursing facility."). These rules also are designed to "improve the quality of resident care by selective and limited allocation of Medicaid beds" for which DADS contracts and "to promote competition." 40 TEX. ADMIN. CODE § 19.2322(b). Since 1985, there has been a moratorium on granting additional Medicaid contracts in an effort to regulate the number of Medicaid beds. *See id.* § 19.2322(d); *Eldercare Props., Inc. v. Tex. Dep't of Human Servs.*, 63 S.W.3d 551, 553 (Tex. App.—Austin 2001), *abrogated on other grounds*, *Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170 (Tex. 2004). The number of Medicaid beds, however, can be increased through waivers and exemptions granted by DADS. *See* 40 TEX. ADMIN. CODE § 19.2322(f)–(h).

One type of waiver is the "community needs waiver," which may be granted if the applicant can show that the current nursing facilities in a community (typically a county, county precinct, city, or ZIP Code) are not sufficient to meet the needs of the community's Medicaid recipients. *Id*. § 19.2322(h)(1). An applicant for a community needs waiver is required to submit to DADS a study, prepared by an independent professional with experience in preparing demographic studies, documenting:

（i) an immediate need for additional Medicaid beds in the community;

(ii) Medicaid residents in the community do not have reasonable access to quality nursing facility care; and

(iii) substantial community support for the new nursing facility or beds.

*Id.* "Waiver applicants who submit false information will not be eligible for a waiver." *Id.* § 19.2322(g)(6).[2] An issued waiver based on an applicant's false information is void. *Id.*

### Events leading to suit

In February 2010, OAC requested a community needs waiver from DADS for the allocation of 120 Medicaid beds for a proposed nursing facility to be built in Rockwall County. Andrew and Orson Berry are the controlling parties of OAC and submitted the waiver-application materials to DADS on OAC's behalf. The materials included the required demographic study, which was prepared by J. Larry Taylor. In the study, Taylor analyzed the population data for Rockwall County and the existing nursing facilities in the county and concluded (1) there was an immediate need for additional Medicaid beds in the area because the existing facilities were full and (2) Medicaid residents do not have reasonable access to quality nursing facility care because two of the four nursing facilities in the county had "serious issues relating to 'quality of care,'" with one of those facilities appearing on a national nursing home watch list. The Center was not one of the two facilities referenced in the study as having "quality of care" issues. OAC also submitted letters in support of its application as required by the regulation. *See id.* § 19.2322(h)(1)(A)(iii).

Senior Care, through its counsel, sent DADS a letter dated July 27, 2010, opposing OAC's waiver request and offered "materials for the State's reflection" as it considered OAC's waiver application. Senior Care asserted OAC had not satisfied the regulatory criteria for a community needs waiver and recommended that DADS deny the application. Senior Care criticized OAC's application materials as containing inaccurate information about the ownership of the four nursing facilities in the county and number of licensed beds in those facilities. It also

---

[2] This provision was amended during the last legislative session. The revised provision, which became effective on October 23, 2013, reads: "DADS may in its sole discretion determine that a waiver applicant that submits false or fraudulent information is not eligible for a waiver. DADS may, in its sole discretion, revoke a waiver issued and decertify Medicaid beds issued based on false or fraudulent information provided by an applicant."

contradicted OAC's demographic information related to the growth of the elderly population in the county and the existing facilities' abilities to serve that population. Senior Care further disapproved of the number of community support letters and stated that the authors of those letters did not understand the capacity of the existing nursing facilities. It informed DADS that practicing physicians and hospital representatives were "confident" in the quality of care provided by the four existing facilities in the county.

Andrew Berry responded to Senior Care's opposition by letter dated August 10, 2010. Andrew disputed Senior Care's demographic and Medicaid occupancy data and stated that "Rockwall County facilities have serious issues with quality of care," citing DADS's website and an online nursing home watch list as the sources of the information. Less than a month later, Senior Care sent DADS a supplemental opposition letter, again countering OAC's demographic and quality-of-care analyses and disputing the immediate need for additional Medicaid beds in the county.

On October 6, 2010, DADS regulatory services manager, Joe Armstrong, sent the Berrys an e-mail, notifying them that DADS had completed the waiver review process, during which it considered "the materials submitted in support of and in opposition to the application as well as DADS' data and public data," and could not recommend approval of OAC's waiver application. DADS also explained that the needs of Medicaid patients would be met without the grant of a waiver because three of the four nursing facilities in the area had requested a ten percent increase in their current bed allocation and thus would be receiving additional Medicaid beds. Orson Berry asked DADS to reconsider the recommendation in a letter dated November 1, 2010. He maintained the recommendation to deny the requested waiver was inconsistent with previous community needs waiver approvals and urged DADS to consider the data it submitted showing the "phenomenal increase" in skilled nursing facility patients for the area. In a separate letter,

counsel for OAC also asked DADS to reconsider its decision, specifically questioning the statements regarding the opponents' requests for a ten percent increase in their bed allocations. She claimed that because no requests for a bed increase had been made, such requests could not have been the basis for a recommendation to deny OAC's waiver application.

DADS ultimately approved OAC's community needs waiver application by letter dated December 29, 2010. DADS stated the waiver application complied with the regulatory requirements and that it was approving a waiver for a new 60-bed Medicaid nursing facility in Rockwall County. DADS summarized its decision in a note to file, dated December 10, 2010:

> Upon closer review of Medicaid occupancy data and family census data, it was noted that the [existing] facilities were reporting a much higher facility census than they were reporting Medicaid occupancy. Medicaid NFs are permitted to "float" their Medicaid beds anywhere in the facility. This enables facilities to maximize occupancy data for monthly Medicaid occupancy reports if they wish to obtain additional Medicaid beds. For two of these three facilities that met [quality of care] requirements, the occupancy rate of Medicaid beds could have been reported in excess of 90% (even up to 100% for most months) . . . had they wished to obtain additional Medicaid beds . . . . These two facilities could have reported Medicaid occupancy data that would have allowed them to receive multiple approvals of Medicaid bed increases since January of 2008. The third facility, which initially opened in April of 2009, has been eligible to report data that would have enabled them to also receive[] additional Medicaid beds as far back as April of 2010. . . . The fact that these facilities could have received many additional Medicaid beds and been able to serve the needs of many additional Medicaid recipients, but did not do so, is not supportive of an assumption that these facilities will, in fact, continue to increase their Medicaid resources when they are able to do so. After consideration of all of these factors, staff of this section determined that meeting the increasing needs for Medicaid services via periodic 10% increases is not a reliable alternative to meet these needs, that the county wide occupancy is extremely high and that additional Medicaid beds allocated via a waiver approval is appropriate and is supported by the circumstances.

Senior Care pressed DADS to reconsider that decision in a February 2011 letter. DADS did not change its decision, and Senior Care filed this lawsuit against appellees, alleging claims

for libel and business disparagement.[3] Senior Care also asked the trial court to enter a judgment declaring that OAC's community needs waiver is void because it was secured through deception in violation of DADS's bed allocation regulations. *See id.* § 19.2322(g)(6).

### *The trial court proceedings*

Senior Care alleged appellees fraudulently acquired Medicaid beds in Rockwall County pursuant to the community needs waiver and made libelous and defamatory statements about it and the Center in the materials submitted as part of the waiver application. Senior Care stated in its original and amended petitions that the alleged defamatory statements appellees made to DADS came from appellees' requests for DADS to reconsider its October 6 recommendation to deny the waiver application. Specifically, Senior Care claimed appellees misrepresented to DADS that the Center and other nursing facility owners or operators in the county "had failed to timely seek Medicaid bed increases that were available to those facilities to accommodate the increasing numbers of Medicaid patients" requiring beds. And it asserted that appellees had "affirmatively represented to [DADS] that [the Center] had 'serious quality of care deficiencies' that caused residents 'actual harm or immediate jeopardy.'" Senior Care also believed appellees "made additional libelous and defamatory statements to other parties." It claimed DADS granted OAC's requested waiver based on appellees' misrepresentations.

Appellees generally denied Senior Care's allegations and asserted the affirmative defenses of truth and contributory negligence. Appellees also asserted as "Other Defenses" that they were not liable to Senior Care because the complained-of statements were entitled to protection under the absolute privilege or qualified privilege. Appellees moved for summary judgment on their "other defenses" and affirmative defenses that the statements were truthful and

---

[3] In its original petition, Senior Care also alleged claims against appellees for fraud and negligent misrepresentation but dropped those claims in an amended petition.

Senior Care's own acts contributed to its injury. Appellees also moved for summary judgment on the basis that Senior Care could not prove the elements of its libel and business disparagement claims and that there was no fact issue on those claims. Appellees further argued Senior Care was not entitled to the requested declaratory relief. Appellees supported their summary-judgment motion with the documents they submitted as part of the waiver application process, the communications to DADS from Senior Care opposing OAC's application, their responses to the opposition, a deposition by written questions to a DADS record keeper, and assumed name certificates for Senior Care.

In its response to appellees' motion, Senior Care identified twenty-one remarks appellees made about the Center to DADS that Senior Care considered to be disparaging. It said those remarks were contained in one or more of the following communications with DADS: (1) Taylor's study submitted with the waiver application, (2) Andrew Berry's August 2010 letter responding to Senior Care's July opposition letter, (3) Orson Berry's November 2010 letter requesting reconsideration of DADS's initial recommendation to deny the request for a waiver, and (4) OAC's counsel's letter for reconsideration. Senior Care attached to its response this evidence as well as excerpts from the depositions of Andrew and Orson Berry, its responses to appellees' interrogatory requests, community needs waivers submitted by the Berrys for other communities, and an e-mail from Orson Berry to DADS in October 2010 regarding DADS's recommendation to deny a waiver application for another community. Appellees filed a reply to Senior Care's response in which it attached three additional exhibits as summary-judgment evidence. Senior Care objected to the exhibits because, among other things, the exhibits were offered by appellees less than twenty-four hours before the trial court's consideration of the motion on the written materials and without leave of court.

The trial court granted appellees' motion for summary judgment in its entirety without stating the basis for its ruling. In the final summary judgment signed on March 17, 2012, the trial court also sustained Senior Care's objections to the late-filed summary-judgment evidence; it said no consideration was given to that evidence.

## DISCUSSION

Senior Care challenges the trial court's summary judgment in six issues. Specifically, it contends the trial court erred in granting summary judgment because appellees' alleged disparaging statements are not absolutely privileged or subject to the qualified privilege (Issues One and Three), appellees did not establish that the statements on which Senior Care bases its libel claims were true (Issue Two), the doctrine of contributory negligence does not present a complete bar to liability on summary judgment (Issue Four), and Senior Care submitted proof on the element of special damages for its business disparagement claim (Issue Five). Senior Care also contends it has standing to seek a declaration that OAC's community needs waiver is void because it is based on false information (Issue Six).

### Standard of Review

We review de novo the trial court's summary judgment. *Mid-Century Ins. Co. of Tex. v. Ademaj*, 243 S.W.3d 618, 621 (Tex. 2007); *Beesley v. Hydrocarbon Separation, Inc.*, 358 S.W.3d 415, 418 (Tex. App.—Dallas 2012, no pet.). When reviewing a traditional summary judgment granted in favor of the defendant, we determine whether the defendant conclusively disproved at least one element of the plaintiff's claim or conclusively proved every element of an affirmative defense. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997). A matter is conclusively established if ordinary minds cannot differ as to the conclusion to be drawn from the evidence. *Beesley*, 358 S.W.3d at 418. The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R.

–9–

CIV. P. 166a(c); *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 800 (Tex. 1994); *Beesley*, 358 S.W.3d at 418 (defendant moving for summary judgment under rule 166a(c) "must show the plaintiff has no cause of action"). In deciding whether a disputed material fact issue exists precluding summary judgment, we must take evidence favorable to the non-movant as true, and we must indulge every reasonable inference and resolve any doubts in favor of the non-movant. *Sysco Food Servs.*, 890 S.W.2d at 800. When, as here, the trial court's order granting summary judgment does not specify the basis for the ruling, we will affirm the summary judgment if any of the theories presented to the trial court are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

**Summary Judgment on Senior Care's Libel and Business Disparagement Claims**

We begin with Senior Care's first issue in which it complains the trial court erred in granting summary judgment because appellees' "disparaging communications to [DADS], made outside of any adversarial process, are not absolutely privileged, as a matter of law."

*Applicable Law*

"An absolutely privileged communication is one for which, by reason of the occasion upon which it was made, no remedy exists in a civil action for libel or slander." *Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 912 (Tex. 1942). This is true even if the communication was false and made or published with express malice. *Id.*; *Perdue, Brackett, Flores, Utt & Burns v. Linebarger, Goggan, Blair, Sampson & Meeks, L.L.P.*, 291 S.W.3d 448, 451 (Tex. App.—Fort Worth 2009, no pet.). When the absolute privilege applies to a communication, it functions "as an immunity" because it is based on the actor's personal position or status and not on the actor's motivation. *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 768 (Tex. 1987); *Jenevein v. Friedman*, 114 S.W.3d 743, 745–46 (Tex. App.—Dallas 2003, no pet.) ("The law allows absolute privilege or immunity for a communication

–10–

because of the occasion in which it is made."). That is, the "absolute privilege is not a defense. Rather, absolutely privileged communications are not actionable." *CEDA Corp. v. City of Houston*, 817 S.W.2d 846, 849 (Tex. App.—Houston [1st Dist.] 1991, writ denied); *see also Reagan*, 166 S.W.2d at 912 (noting that communications subject to the privilege "cannot constitute the basis of a civil action"). The immunity conferred by the absolute privilege attaches "only to a limited and select number of situations which involve the administration of the functions of the branches of government, such as statements made during legislative and judicial proceedings." *Hurlbut*, 749 S.W.2d at 768; *see also* RESTATEMENT (SECOND) OF TORTS §§ 585–91 (1977) (discussing application of absolute privilege). It also extends to quasi-judicial proceedings, such as proceedings before executive officers and boards and commissions that exercise quasi-judicial powers. *Reagan*, 166 S.W.2d at 912–13.

Two requirements must be met for the privilege to apply: (1) the governmental entity must have the authority to investigate and decide the issue—that is, it must exercise quasi-judicial power—and (2) the communication must relate to a pending or proposed quasi-judicial proceeding. *Perdue*, 291 S.W.3d at 452. "A governmental entity's power to decide a controversy presented by an allegedly defamatory statement is a key factor in determining whether the defamatory statement relates to the exercise of quasi-judicial power." *Id.*; *compare Reagan*, 166 S.W.2d at 913 (concluding Board of Insurance Commissioners exercised quasi-judicial power when it decided whether to issue insurance sales license), *Putter v. Anderson*, 601 S.W.2d 73, 77 (Tex. Civ. App.—Dallas 1980, writ ref'd n.r.e.) (concluding internal affairs division of Dallas police department was quasi-judicial body when exercised duty to investigate citizen's written complaint of police officer), *5-State Helicopters, Inc. v. Cox*, 146 S.W.3d 254, 258 (Tex. App.—Fort Worth 2004, pet. denied) ("Because the FAA had the authority to both initiate the investigation into whether appellants were in compliance with federal air safety laws

–11–

and dispose of appellants' violation administratively without legal enforcement action, the FAA's actions stemming from the . . . inspection constituted a quasi-judicial proceeding."), *and Shanks v. AlliedSignal, Inc.*, 169 F.3d 988, 994 (5th Cir. 1999) (concluding NTSB accident investigation qualified as quasi-judicial proceeding under Texas law), *with Hurlbut*, 749 S.W.2d at 768 (unsolicited communications to law enforcement officials not absolutely privileged because communications made in advance of formal proceeding or investigation), *and Parker v. Holbrook*, 647 S.W.2d 692, 696 (Tex. App.—Houston [1st Dist.] 1982, writ ref'd n.r.e.) (denying absolute privilege to communication to regional council of county governments charged with making recommendations to federal agencies on requests for health services grants because council decisions only "preliminary in nature").

The question of whether an alleged defamatory communication is related to a proposed or existing judicial or quasi-judicial proceeding, and is therefore absolutely privileged, is one of law to be determined by the court. *Perdue*, 291 S.W.3d at 453; *Russell v. Clark*, 620 S.W.2d 865, 870 (Tex. Civ. App.—Dallas 1981, writ ref'd n.r.e.). When deciding the issue, we consider the entire communication in its context, and we must extend the privilege to any statement that bears some relation to an existing or proposed judicial or quasi-judicial proceeding. *Russell*, 620 S.W.2d at 870. All doubt should be resolved in favor of the communication's relation to the proceeding. *Id.*

### *Analysis*

The first question in our analysis is whether DADS possessed quasi-judicial power when it reviewed OAC's community needs waiver application and Senior Care's opposition and decided the issue of whether to grant a waiver to OAC. *See Perdue*, 291 S.W.3d at 452. Senior Care contends the process of merely conveying information to a public official does not qualify as a quasi-judicial proceeding subject to the absolute privilege. It specifically characterizes the

community needs waiver application process as a "glorified permit application process" and argues DADS was not acting in a quasi-judicial capacity because DADS "was not deciding an adversarial matter between Senior Care and [appellees], but was deciding whether to grant [appellees] a waiver based on the merits of [appellees'] application." We disagree with Senior Care's characterization.

As previously outlined, DADS has the statutory responsibility to administer and monitor the state's Medicaid program, including the responsibility to establish methods of administration and adopt necessary rules to ensure proper operation of the program. *See* TEX. HUM. RES. CODE ANN. § 32.021(a), (c). In particular, DADS is empowered to (1) issue and renew nursing facility licenses "after inspection and investigation," TEX. HEALTH & SAFETY CODE ANN. § 242.033(a); (2) promulgate and enforce rules and minimum standards, relating to, among other things, licensing of institutions, quality of care, and residents' rights, *id.* § 242.037(a), (e)(9)–(10); *id.* § 242.043; TEX. HUM. RES. CODE ANN. § 32.021(g); (3) deny, suspend, or revoke nursing facility licenses if DADS finds the licensed facility has violated DADS's contract, rules or regulations or committed a prohibited act, TEX. HEALTH & SAFETY CODE ANN. § 242.061(a); and (4) assess civil or administrative penalties, *id.* §§ 242.065–.066. DADS also contracts with nursing facilities to provide a specific number of Medicaid-certified beds and makes the rules for nursing facility bed certification and decertification. TEX. HUM. RES. CODE ANN. § 32.0213(a); 40 TEX. ADMIN. CODE § 19.2322(c); *see also* 40 TEX. ADMIN. CODE § 19.2322(l)(1) (DADS "may review Medicaid bed occupancy rates annually for the purpose of de-allocating and decertifying unused Medicaid beds."); *Eldercare Props., Inc.*, 63 S.W.3d at 558 (human resources code section 32.021(c) grants rulemaking authority as necessary for administration of Medicaid program).

DADS controls the number of Medicaid beds in a nursing facility through its bed allocation rules and policies. 40 TEX. ADMIN. CODE § 19.2322(b)–(d). Beds are allocated to the

nursing facility, and the rights to all allocated Medicaid beds belong to the property owner. *Id.* § 19.2322(c)(3). The process by which DADS allocates Medicaid beds is "selective and limited" and aimed at improving quality of resident care and promoting competition. *Id.* § 19.2322(b).

One of the ways in which DADS controls the allocation of Medicaid beds is through the grant of exemptions and waivers. *Id.* § 19.2322(c), (e), (f)–(h). Waivers, such as a community needs waiver, are granted only under certain conditions. *Id.* § 19.2322(g). One condition is that the applicant must demonstrate a history of providing quality care, which is determined by considering whether the applicant has received any sanctions (such as termination of a Medicaid contract, denial, suspension, or revocation of license, assessment of civil or administrative penalties) and finding no clear pattern of substantial or repeated licensing and Medicaid sanctions. *Id.* § 19.2322(e)(1), (g)(1).[4] An applicant also must satisfy the regulatory criteria for submitting a community needs waiver application. *Id.* § 19.2322(h)(1).

DADS does not decide to grant a waiver based on the merits of the applicant's waiver application alone. In making its determination of whether the allocation of additional Medicaid beds is necessary, DADS considers the required materials submitted with the application, DADS's own data, such as the Medicaid occupancy rate reports submitted monthly by the existing Medicaid nursing facilities, and public data, such as "facility census data." *Id.* § 19.2322(h)(1), (m).[5] And, as the summary-judgment evidence in this case shows, DADS also considers materials submitted in opposition to the waiver application and the advice of legal

---

[4] When an applicant has no history of operating nursing facilities, health-care facilities operated or controlled by the applicant's controlling parties will be reviewed. If neither the controlling parties nor the applicant have operated, managed, or otherwise controlled any health-care facilities, a compliance review will not be required. *Id.* § 19.2322(e)(5).

[5] DADS calculates the nursing facility and county occupancy rates "based on the data submitted by the nursing facilities." *Id.* § 19.2322(m)(1)(B), (2).

counsel; it also may meet "with the [Regulatory Services] section director" to determine whether a waiver application should be approved.[6]

The applicant's mere submission of the required application materials that satisfy the regulatory criteria does not guarantee a grant of a waiver. Rather, DADS has the discretion to grant a waiver based on its determination that additional Medicaid beds are necessary. *See id.* § 19.2322(h) ("Waivers may be granted if it is determined that Medicaid beds are necessary for the following circumstances.").[7] An applicant can request an informal review of DADS's actions regarding bed allocations. *Id.* § 19.2322(k).[8] Finally, DADS is authorized to void a waiver that was granted if it was determined to be based on false information. *Id.* § 19.2322(g)(6).

Courts have delineated six powers that are relevant to our determination of whether DADS possessed quasi-judicial power with respect to the waiver review process:

(1) the power to exercise judgment and discretion;

(2) the power to hear and determine or to ascertain facts and decide;

(3) the power to make binding orders and judgments;

(4) the power to affect the personal or property rights of private persons;

(5) the power to examine witnesses, to compel the attendance of witnesses, and to hear the litigation of issues on a hearing; and

(6) the power to enforce decisions or impose penalties.

---

[6] Effective September 1, 2011, DADS published on its website additional "General Policies for Waivers," including the policy that "[w]hen DADS receives a waiver application, DADS will notify all nursing facilities in the county . . . that DADS has received a waiver application, that the nursing facilities may request copies of the application documents via an open records request, and that a facility or its representative may comment on the application." Medicaid Bed Allocation Updates, http://www.dads.state.tx.us/providers/nf/MedicaidBedAllocationUpdateFy2012.pdf (Sept. 1, 2011). A notified facility that opposes the waiver application "may submit information or data in opposition to the application," and the applicant may submit "a written response to the opposition documents."

[7] Correspondence from DADS submitted as summary-judgment evidence also reveals that DADS will consider issuance of a waiver only in instances in which it "is convinced the needs of local Medicaid recipients cannot be met by non-waiver avenues . . . ."

[8] The updated general policies permit not only an applicant but also any other non-prevailing party (such as the opponent, if the application is granted), to challenge the basis for the proposed recommendation rendered by DADS. The challenge and any responses to the challenge will be considered when DADS makes a final recommendation.

*Perdue*, 291 S.W.3d at 453. DADS need not possess all six powers to be considered quasi-judicial. *Parker*, 647 S.W.2d at 695.

The provisions related to the control and allocation of Medicaid beds found in the human resources code and chapter 40 of the administrative code explicitly confer on DADS several of the delineated quasi-judicial powers. DADS, in its capacity as a state agency, not only makes the rules regarding Medicaid bed allocations, TEX. HUM. RES. CODE ANN. § 32.0213(a), but also it is the decision-making body with respect to determining whether to grant or deny an exemption or waiver to an entity requesting a Medicaid bed allocation. *See* 40 TEX. ADMIN. CODE § 19.2322(c), (e), (f)–(h). DADS has the power to ascertain the existence of facts from its review of the evidence relevant to the waiver application, including the applicant's materials, the materials submitted in opposition, its own data, and public data, and to weigh and draw conclusions from its review of this evidence as a basis for its decision to grant or deny a community needs waiver. And in deciding the course of its official action, DADS exercises its judgment and discretion; a waiver "may be granted" if DADS is convinced that additional Medicaid beds are necessary and the need cannot be met through other non-waiver avenues. *Id.* § 19.2322(h). DADS can dispose of the application administratively, and its decisions need not be ratified by another agency. *See, e.g.*, *Parker*, 647 S.W.2d at 696 (denying absolute privilege to communication that was only "preliminary in nature").

Further, DADS can penalize an applicant who submits false information by making the applicant ineligible for a waiver and voiding an issued waiver if it finds the information provided was false. 40 TEX. ADMIN. CODE § 19.2322(g)(6). This power also implies the power to exercise judgment and to decide an issue based on the facts it discovered and determined. Finally, because DADS's "selective" and "limited" allocation of Medicaid beds is designed to improve the quality of resident care, its determination of whether to grant or deny a community

needs waiver also may invoke its other responsibilities related to administering the state's Medicaid program, such as performing an inspection or investigation of a nursing facility "that it considers necessary" and evaluating "data for quality of care in nursing homes." TEX. HEALTH & SAFETY CODE ANN. §§ 242.043(a), 242.049(a). DADS has the power to deny, suspend, or revoke nursing facility licenses and assess various other sanctions against those licensees. *Id.* §§ 242.061, 262.065–.066.

Senior Care contends the absolute privilege has no place in the context of an "informal waiver application" process because that process lacks the protections afforded by the adversarial judicial system. It argues, in essence, that for the privilege to apply, the administrative body must be acting in a role or have duties similar to that of a judge in a contested judicial proceeding when the offending statement is made and the proceeding must have the functional characteristics of a judicial proceeding, citing *Sledd v. Garrett*, 123 S.W.3d 592 (Tex. App.—Houston [14th Dist.] 2003, no pet.), *Parker*, 647 S.W.2d at 697, and *Koehler v. Dubose*, 200 S.W. 238 (Tex. Civ. App.—San Antonio 1918, writ ref'd). It claims that where the protections commonly found in judicial proceedings (i.e., the right to cross-examine and subpoena witnesses, the right to compel testimony under oath subject to perjury, the right to notice, and the right to a hearing) are absent, a qualified privilege is more appropriate.

But the fact that the waiver application process at issue here did not involve an administrative hearing or formal adjudication does not alter the quasi-judicial nature of the process. *See 5-State Helicopters*, 146 S.W.3d at 259; *cf. Parker*, 647 S.W.2d at 695 (proceeding need not meet all of the delineated powers to be considered quasi-judicial). The first requirement that must be met for the absolute privilege to apply is determining whether DADS had the power and authority to investigate and decide the issue before it or exercised quasi-judicial power. *Perdue*, 291 S.W.3d at 452; *5-State Helicopters*, 146 S.W.3d at 259 ("A proceeding's quasi-

–17–

judicial status depends on whether the entity has the *authority* to investigate and decide the matters at issue, not on the length, complexity, or outcome of the proceeding."); *see also Reagan*, 166 S.W.2d at 912–13 (absolute privilege extends to administrative body that exercises quasi-judicial powers). Here, DADS had the power and authority to decide the issue of whether to grant or deny a community needs waiver to OAC. In doing so, DADS reviewed the evidence to ascertain facts relevant to the question of whether such a waiver was necessary and decide the issue based on what it learned from its review. The issue it decided and acted upon was an issue that was contested by Senior Care; the summary-judgment evidence shows that Senior Care and others opposed the allocation of Medicaid beds to OAC based on a community needs waiver. DADS considered the materials submitted in opposition as part of its review as well as its own data and data submitted monthly by the existing nursing facilities.

The cases cited by Senior Care do not persuade us that the formalities and protections found in a judicial proceeding are required before the absolute privilege may apply. For example, *Sledd* involved the question of whether members of a county appraisal review board were quasi-judicial officials for purposes of the doctrine of judicial immunity. *Sledd*, 123 S.W.3d at 594. In determining whether the members were entitled to judicial immunity on Sledd's negligence claims, the court examined the functions they performed "to see if these functions are comparable to those of judges." *Id.* The analysis in this case, however, involves whether certain statements were entitled to protection based on the context in which the statements were made. We examine whether DADS has the authority to investigate and decide an issue or possessed quasi-judicial powers. *Reagan*, 166 S.W.2d at 912–13. We do not read *Sledd* as requiring DADS to have duties similar to a judge before the absolute privilege may apply.

In *Parker*, the court concluded that a hearing held before a committee of the Houston-Galveston Area Council was not quasi-judicial in nature because the decisions made by the council were preliminary in nature, and although the council compiled information and made a conclusion based on the information gathered, it lacked the power to enforce the decision because it was not the final decision maker. *Parker*, 647 S.W.2d at 697. In contrast, DADS controls the number of Medicaid beds in a nursing facility and determines how those beds are allocated in a community. It alone decides whether to grant or deny a community needs waiver based on its evaluation of the information gathered and received. The court in *Parker* also noted that council meetings do not have other inherent safeguards against defamation found in the judicial context—a confidentiality requirement and threat of sanctions should an individual abuse the proceeding by perjuring himself—because meetings before the council were required to be open to the public and the council lacked the authority to sanction an individual who commits perjury. *See id.* But those concerns are not present here. The summary-judgment record shows that the contested communications were confined to communications made to DADS and were not part of a proceeding mandated to be open to the public. DADS also has the power to void an application if it finds the application was based on false information, and a waiver applicant who submits false information will not be eligible for a waiver. 40 TEX. ADMIN. CODE § 19.2322(g)(6).

*Koehler* also is distinguishable from this case. The court in *Koehler* concluded that no privilege applied to letters urging the state comptroller to deny the renewal of a liquor license when no proceeding for renewal of the license was pending; also relevant was the fact that the letters did not urge revocation of the appellant's liquor license. *Koehler*, 200 S.W. at 244–45. The court also observed that the offending communication had been circulated "promiscuously" in the community and it was presumed that many saw it. *Id.* at 245. The court explained that the

"method of communication may strip a privilege of its character and transform into a libel," and stated "it lost its privileged character by being published throughout the community." *Id.* The complained-of communications in this case were part of a process leading to an official action by DADS. The communications were sent to DADS and were not widely circulated.

Senior Care further complains that appellees' statements about it "were offered gratuitously and incident to a process that does not even offer the subject of the defamatory communications the legal right to schedule a hearing or provide a rebuttal." Despite its complaints about there being no formal process for opposing a waiver application, the summary-judgment evidence shows that Senior Care had a chance to be heard on the relevant issues (it rebutted OAC's waiver application by submitting two opposition letters with materials and sent a third letter asking DADS to reconsider its decision to grant a waiver to OAC) and was heard on the issue. Correspondence and other documents from DADS included as summary-judgment evidence show that current nursing facilities located in the county submitted data and other information in opposition to the waiver application through their legal counsel and that DADS considered the oppositions' position when it decided the issue.

"The absolute privilege is intended to protect the integrity of the process itself and to insure that the decision-making body gets the information it needs." *Attaya v. Shoukfeh*, 962 S.W.2d 237, 239 (Tex. App.—Amarillo 1998, pet. denied). Based on the powers conferred by the relevant statutes and regulations and the facts and circumstances contained in this record, it is apparent that DADS possessed quasi-judicial power on the issue of whether to grant or deny OAC's request for a community needs waiver. And because DADS exercised its quasi-judicial power when it decided the issue of whether to grant a community needs waiver to OAC, the proceeding in question was quasi-judicial.

–20–

There appears to be no dispute about whether the allegedly defamatory communications were related to a pending or proposed quasi-judicial proceeding, the second part of our analysis. *Perdue*, 291 S.W.3d at 452. The complained-of statements were made in the context of OAC's request for a community needs waiver for the allocation of Medicaid beds for its new facility. Senior Care has not pointed to any additional defamatory statements by appellees that were made outside the waiver application process. *Cf. Russell*, 620 S.W.2d at 870 (stating that even if there was some doubt as to a communication's relevance to the proceeding, we would be required to resolve it in favor of—not against—a relation to the proceeding).

One of the grounds on which appellees moved for summary judgment was that any of the statements Senior Care alleged to be defamatory was absolutely privileged. A defendant is entitled to summary judgment on the basis of absolute privilege only if the evidence conclusively proves the privilege's application. *Hurlbut*, 749 S.W.2d at 768. We conclude that DADS's determination of whether to grant or deny a community needs waiver is a quasi-judicial proceeding from which it follows that any communications made during such a proceeding are absolutely privileged or immune from suit. Appellees therefore demonstrated their entitlement to summary judgment on this basis as a matter of law.

Senior Care argued in its response to appellees' summary-judgment motion that DADS "later acknowledged that it might have made a different determination regarding the waiver if there was a procedural mechanism for a waiver opponent to rebut [appellees'] false information, but noted that no such process exists." But it provided no summary-judgment evidence in support of this argument. Rather, it argued that the absolute privilege does not apply in the circumstances presented by this case and thus failed to raise a fact issue as to appellees' claim of absolute privilege.

Senior Care predicated its libel and business disparagement claims on allegations that statements appellees made to DADS were defamatory and caused it damages. Because Senior Care's claims for libel and business disparagement are for defamation-type damages based on appellees' allegedly defamatory statements, the absolute privilege bars these claims. *See Perdue*, 291 S.W.3d at 455; *Daystar Residential, Inc. v. Collmer*, 176 S.W.3d 24, 27–29 (Tex. App.— Houston [1st Dist.] 2004, pet. denied) (recognizing privilege with respect to business disparagement claim); *see also Bird v. W.C.W.*, 868 S.W.2d 767, 771–72 (Tex. 1994) (extending absolute privilege beyond defamation cases to bar suits where damages "are basically defamation damages"); *5-State Helicopters*, 146 S.W.3d at 259; *Attaya*, 962 S.W.2d at 240 (extending privilege to "all perceived torts or other causes of action" arising from defendant's conduct and communication with Texas State Board of Medical Examiners). Accordingly, we conclude the trial court did not err in granting summary judgment for appellees on this ground. We overrule Senior Care's first issue.

Based on our resolution of Senior Care's first issue, we need not address its second through fifth issues, which address the other grounds raised by appellees' summary-judgment motion. *See* Tex. R. App. P. 47.1. The final question before us is whether the trial court properly granted summary judgment on Senior Care's request for declaratory relief.

### Summary Judgment on Requested Declaratory Relief

Senior Care's sixth issue relates to the summary judgment granted on its claim for declaratory relief. Senior Care alleged appellees violated section 19.2322(g)(6) of title 40 of the Texas Administrative Code when they submitted false information to DADS incident to OAC's waiver application. *See* 40 Tex. Admin. Code § 19.2322(g)(6). Based on that violation, it asked the trial court to declare that the "community needs waiver secured by [appellees] is void, as a matter of law, because [appellees] made express misrepresentations in order to secure the waiver

and it was based on false information." Alternatively, it asked the trial court to declare that appellees submitted false information to DADS in violation of section 19.2322(g)(6) "so that [DADS] can make a determination regarding whether [OAC's] community needs waiver is void" under that section.

Appellees moved for summary judgment on this claim, arguing Senior Care had no standing to assert the claim because there was no controversy between them that would be determined by the declaration sought and Senior Care had no justiciable interest in DADS's approval of OAC's waiver application. Appellees also argued that DADS, as the state agency responsible for administering the Medicaid long-term care programs in Texas, is "independently capable of determining whether information provided to it" was false. They added that DADS is empowered to evaluate the application materials and determine whether the applicant's materials meet the regulatory requirements. Appellees further asserted that Senior Care had no right to judicial review of DADS's decision to grant OAC a community need waiver because that decision does not adversely affect a vested property right or franchise of Senior Care.

On appeal, Senior Care contends the trial court improperly granted summary judgment for appellees on this claim because it has the right to judicial review of an agency decision that creates unfair and illegal competition in a nursing home business that is government-regulated and affected by public use and is of public interest. Appellees respond that Senior Care has not stated a justiciable controversy because even if the trial court were to declare that appellees made express misrepresentations and submitted false information in the waiver application and other communications, a second action would be necessary to achieve what Senior Care is seeking; "that being a declaration that the community needs waiver is void." Appellees claim that if the trial court made such a declaration, it would be "step[ping] into the shoes of DADS in its deliberative process." They maintain that such review of an administrative determination is not

–23–

permitted because it requires the trial court to substitute itself for the administrative body and perform administrative tasks.

Appellees also argue that if Senior Care "wanted a declaration that the granting of a community needs waiver by DADS is void," it would be required to seek such a declaration directly against DADS in Travis County, citing section 2001.038 of the Administrative Procedure Act. TEX. GOV'T CODE ANN. § 2001.038(a)–(c) (West 2008). That section provides that when the subject of a declaratory action concerns the validity or application of an administrative rule to a private entity, the action may be brought only in a Travis County district court and the "state agency must be made a party to the action." *Id.*; *see also Sierra Home Care*, 235 S.W.3d at 838 (concluding Travis County was proper forum in suit for declarations that DADS applied its administrative regulations in unconstitutional manner and therefore, El Paso court did not have subject-matter jurisdiction).

Senior Care claims the Administrative Procedure Act does not apply because it is not challenging the validity or applicability of a rule. Rather, it is seeking a fact-finding that the information appellees submitted to DADS was false and therefore the waiver granted is void. Senior Care contends this case is similar to *Texas Department of Health v. Texas Health Enterprises, Inc.*, 871 S.W.2d 498, 506 (Tex. App.—Dallas 1993, writ denied), *overruled on other grounds*, *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401 (Tex. 1997), in which a panel of this Court said that a nursing home seeking injunctive relief related to the suspension of its Medicaid vendor payments, was not challenging the rulemaking or enforcement authority of the agency. In that case, however, the relief sought was to prevent the wrongful acts—the withholding of Medicaid vendor payments—of the state agency or administrator of the State's medical assistance program. *Id.* And unlike here, the administrator was a defendant to the action.

Senior Care is essentially asking the trial court to apply an administrative regulation to the community needs waiver granted to OAC. *Cf. Eldercare Props., Inc.*, 63 S.W.3d at 558 (noting that an applicability challenge "supplies the petitioner with the opportunity to obtain a judicial declaration of the application of an existing administrative rule to [a] particular fact situation"). But under its conferred authority, DADS is the agency that gets to decide whether a waiver is void because it was based on false information. 40 TEX. ADMIN. CODE § 19.2322(g)(6). While courts may provide declaratory relief when the agency is exercising authority beyond its statutorily conferred powers, such as in *Texas Health Enterprises*, courts may not step into the shoes of an agency to perform an act that the agency has the discretion and authority to perform. We conclude the Administrative Procedure Act applies to Senior Care's request for declaratory relief and therefore, the trial court lacked subject-matter jurisdiction over this claim.

Appellees did not move for summary judgment on this precise ground, but they alluded to this contention in their summary-judgment motion when they argued that because DADS is the agency responsible for such determinations, it had the power to evaluate the materials and was capable of determining whether information provided by an applicant was false in contravention of section 19.2322(g)(6). Subject-matter jurisdiction, however, is essential for a court to have authority to decide a case, and because it is never presumed and cannot be waived, we are not precluded from considering the issue on appeal. *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012) (noting appellate court not precluded from considering immunity for first time on interlocutory appeal because immunity deprives court of subject matter jurisdiction); *Alfonso v. Skadden*, 251 S.W.3d 52, 55 (Tex. 2008) (per curiam) (subject-matter jurisdiction cannot be waived and can be raised at any time); *Tex. Ass'n of Bus. v. Tex. Air*

*Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993) (subject-matter jurisdiction never presumed and cannot be waived).

Because the trial court lacked subject-matter jurisdiction over Senior Care's claim for declaratory relief, summary judgment on this ground was in error. We therefore sustain Senior Care's issue to the extent that it asserts the trial court erred in granting summary judgment on this claim. We vacate the trial court's summary judgment as to Senior Care's claim for declaratory relief and render judgment dismissing that claim for lack of subject-matter jurisdiction.

We affirm the trial court's final summary judgment in all other respects.

/Martin Richter/
MARTIN RICHTER
JUSTICE, ASSIGNED

120459F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

SENIOR CARE RESOURCES, INC.,
Appellant

No. 05-12-00495-CV          V.

OAC SENIOR LIVING, LLC, ANDREW
BERRY, AND ORSON BERRY, Appellees

On Appeal from the 101st Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 11-07170.
Opinion delivered by Justice Richter.
Justices Moseley and Lang participating.

In accordance with this Court's opinion of this date, the trial court's final summary judgment dated March 17, 2012 is **AFFIRMED** in part and **VACATED** in part. We **VACATE** that portion of the trial court's judgment with respect to appellant Senior Care Resources, Inc.'s claim for declaratory relief, and we **DISMISS** that claim for lack of subject-matter jurisdiction. In all other respects, the trial court's judgment is **AFFIRMED**.

It is **ORDERED** that appellees, OAC Senior Living, LLC, Andrew Berry, and Orson Berry, recover their costs of this appeal from appellant Senior Care Resources, Inc.

Judgment entered this 5th day of March, 2014.

/Martin Richter/

MARTIN RICHTER
JUSTICE, ASSIGNED